# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No. _08-2709- STB_

IN RE SEALED COMPLAINT

_____/

## CRIMINAL COVER SHEET

1.   Did this matter originate from a matter pending in the Northern Region of the United States
     Attorney's Office prior to October 14, 2003?  _____ Yes   _X_ No

2.   Did this matter originate from a matter pending in the Central Region of the United States
     Attorney's Office prior to September 1, 2007?  _____ Yes   _X_ No

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

BY: _____

ERIC E. MORALES
ASSISTANT UNITED STATES ATTORNEY
Court No. A5500886
99 N. E. 4th Street
Miami, Florida  33132-2111
TEL (305) 961-9255
FAX (305)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 08-2709-STB

UNITED STATES OF AMERICA

vs.

ASHOK NARAIN MAHIBUBANI-
LADHARAM, and
SANJAY MAHIBUBANI-LADHARAM
Defendants.

_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States
    Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2.  Did this matter originate from a matter pending in the Central Region of the United States
    Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

BY: _____

ERIC E. MORALES
ASSISTANT UNITED STATES ATTORNEY
Court I.D. No. A5500886
99 N. E. 4th Street
Miami, Florida  33132-2111
TEL:  (305) 961-9255
FAX:  (305) 536-7213

### United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

v.

ASHOK NARAIN MAHIBUBANI-LADHARAM, and
SANJAY MAHIBUBANI-LADHARAM.

## CRIMINAL COMPLAINT

CASE NUMBER: 08-2709-STB

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From on or about June 8, 2007, through on or about January 28, 2008, in Miami-Dade County, in the Southern District of Florida, and elsewhere, defendants, Ashok Narain Mahibubani-Ladharam and Sanjay Mahibubani-Ladharam, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with other persons, to import into the United States from a place outside thereof a Schedule II controlled substance, that is, five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 952(a) and 960(b)(1)(B); all in violation of Title 21, United States Code, Section 963; and knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with other persons, to conduct and attempt to conduct financial transactions which in fact involved the proceeds of specified unlawful activity, that is, the felonious receiving, importing, concealment, buying, selling, and otherwise dealing in a controlled substances, punishable under the laws of the United States, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section1956(a)(1)(B)(i); all in violation of Title 18, United States Code, Section 1956(h); and on or about January 22, 2008, the defendants did knowingly and intentionally attempt to import into the United States, from a place outside thereof, a Schedule II controlled substance, that is, five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 952(a) and 960(b)(1)(B); all in violation of Title 21, United States Code, Sections 963 and 2.

I further state that I am a Special Agent with Drug Enforcement Administration and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

5/2/2008

CHRISTOPHER C. GOUMENIS, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me, and subscribed in my presence,

May 27, 2008                              at
Date

Miami, Florida
City and State

STEPHEN T. BROWN
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Christopher C. Goumenis, being duly sworn, hereby depose and state as follows:

1.      I am a Special Agent (SA) with the Drug Enforcement Administration (DEA) assigned to the Miami Field Division. I have been a SA for approximately four years, during which time I have specialized in investigations involving narcotics trafficking and money laundering. Prior to being hired by the DEA, I was a police officer for approximately six years. I have received specialized training on the subject of narcotics trafficking and money laundering from the DEA. I have been personally involved in investigations concerning the possession, manufacture, distribution and importation of controlled substances, the methods used to finance illegal narcotics transactions, and the seizure and forfeiture of assets and funds.

2.      The information contained in this Affidavit is based upon my personal knowledge as well as information, and documents obtained from other law enforcement officers and through our investigation. This affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint against Ashok Narain MAHIBUBANI-LADHARAM (hereinafter ASHOK) and Sanjay MAHIBUBANI-LADHARAM (hereinafter SANJAY). Due to this limited purpose, this Affidavit does not contain all the facts known to me relating to this investigation.

3.      On or about June 8, 2007, a source (CS-1) advised that ASHOK was a money launderer and drug trafficker that CS-1 had worked with in the past and that ASHOK resides in Panama. CS-1 provided us with the MSN Hotmail e-mail account that ASHOK utilizes.

4.      As part of his cooperation with law enforcement, beginning on or about June 8, 2007, CS-1 began communicating with ASHOK and SANJAY via instant messaging text conversations (hereinafter referred to as "chats"),[1] telephone conversations, and e-mail. Following DEA instructions, CS-1 saved the chats he had during the course of this investigation and provided DEA with the saved file of the chats, which read much like a transcript. The following paragraphs contain summaries of these communications. As is often the case among persons engaged in narcotics and money laundering, the communications were conducted in coded language. Therefore, I have used my training and experience, as well as knowledge gained during this investigation, to interpret the coded communications.

5.      On or about June 8, 2007, CS-1 communicated with ASHOK via chat. CS-1 informed ASHOK that CS-1 was in Miami, Florida. CS-1 informed ASHOK that CS-1

---

[1] Instant messaging is a means of communication through the internet where two persons connected to the internet access a common service, such as MSN Hotmail or YAHOO, log into their e-mail accounts and access into the instant messenger feature. The two participants can then write each other messages that are transmitted over the internet in real time, and in this way converse or "chat."

needed work. ASHOK responded that it should be no problem. CS-1 then asked ASHOK if he can ship to my boat (meaning whether ASHOK can supply narcotics to CS-1 in Miami). ASHOK again responded that it is not a problem. CS-1 and ASHOK then discussed suppliers and the amount of time it would take to send the cocaine. ASHOK then asked CS-1 "how many (meaning how many kilograms of cocaine) do you need?" CS-1 responded 50 to 100 maximum. ASHOK responded again that it should be no problem. The conversation continued with discussion of profit that can be made, cost per kilogram, and the means to smuggle the kilograms. ASHOK provided CS-1 a telephone number to contact ASHOK in Panama.

6.    In another chat on June 14, 2007, CS-1 informed ASHOK that CS-1 had the means to move money for ASHOK, via wire or bulk cash smuggling. CS-1 informed ASHOK that CS-1 charges 12% commission on the money and that he could start with $200,000 to 250,000. ASHOK and CS-1 then discussed what percentage of the commission ASHOK would get for arranging money pick ups on behalf of 3rd parties. Between June 15 and July 15, ASHOK and CS-1 continued to communicate regarding possible earnings that they could make from cocaine smuggling, commission rates that could be charged for money laundering transactions, and the legal status of different money launderers and narcotics traffickers in Panama.

## July 18, 2007, Transaction

7.    On July 16, 2007, ASHOK advised CS-1 in a chat that he (ASHOK) "has 250 in NYC" (meaning that ASHOK had or knew of $250,000 in New York that needed to be laundered). ASHOK asked CS-1 how CS-1 wanted to proceed. CS-1 instructed ASHOK to give CS-1's telephone number to the person who had the money and tell that person to ask for "Michael." ASHOK then asked CS-1 how much CS-1 would charge to move the money. CS-1 stated 12% (meaning 12% of the money as a fee). ASHOK asked CS-1 to lower the percentage.

8.    On July 16, 2007, ASHOK placed a telephone call to CS-1. During this telephone conversation, CS-1 asked ASHOK when he would like the money picked up. CS-1 asked if tomorrow would be fine. ASHOK stated that he was asking for 12, but the other guys wanted 10 (meaning that ASHOK was asking the owner of the money for 12% fee, but the owner wanted to pay 10%). CS-1 asked ASHOK what is the reference, 2 or 25 (meaning whether it would be $200,000 or $250,000). ASHOK replies in the affirmative (meaning it could be either $200,000 or $250,000).

9.    On or about July 17, 2007, CS-1 chatted with SANJAY (SANJAY), who was utilizing an MSN Hotmail e-mail account. SANJAY is ASHOK's brother and also resides in Panama. According to information received from MSN Hotmail, the company that serves and houses e-mail account used by SANJAY, said email account is registered to SANJAY's name. In this e-mail chat, SANJAY asked CS-1 if CS-1 had received any telephone calls yet. This was a reference by SANJAY to the call from the person who had the money that ASHOK was arranging for the CS-1 to receive in New York.

2

10.     On or about July 18, 2007, a DEA confidential source operating in New York (hereinafter "CS-2"), returned a telephone call to an unknown male that had contacted CS-1 on behalf of ASHOK regarding the pending money laundering transaction. CS-2 represented himself to be the person who would be picking up the money for CS-1. The unknown male and CS-2 set up a meeting later that afternoon at an agreed upon location in Queens, New York. Law enforcement agents surveilling the meeting observed CS-2 meet in a parking lot with two males who were in a rented vehicle. In the vehicle, one of the males told the other male to give CS-2 the package. CS-2 received a cardboard box and got out of the vehicle. Inside the cardboard box CS-2 received in the vehicle was $250,040 dollars.

11.     Later on July 18, 2007, CS-1 telephoned ASHOK to let him know that the "package" had been received. ASHOK asked CS-1 if the package was "big."

12.     The funds received by CS-2 in New York on July 18 were transported to Miami, Florida, and deposited into a DEA undercover bank account in Miami. From July 20, 2007 to July 23, 2007, DEA Agents, acting in an undercover capacity, electronically wire transferred funds from the undercover account as per instructions given to CS-1 by either SANJAY or ASHOK. These transactions were as follows:

a)     On July 20, 2007, a wire for $64,605 was sent to Shivatex Manufacturing Co., Inc. at Banco De Oro, Philippines Branch. (According to Shivatex Manufacturing Co.'s website, this company was established by ASHOK in 1993, and SANJAY is one of the contacts for the company.)

b)     On July 20, 2007, a wire for $64,605 was sent to an account at China Banking Corporation, Buendia Branch.

c)     On July 20, 2007, a wire for $58,475 was sent to an account at Hong Kong & Shanghai Banking Corporation, Hong Kong Branch, as per instructions SANJAY provided CS-1 on July 19, 2007.

d)     On July 20, 2007, a wire for $44,814 to an account at Indian Overseas Bank, Hong Kong Branch as per instructions SANJAY provided CS-1 on July 19, 2007.

13.     On or about July 20, 2007, Agents learned that Bank of America returned the wire transfer of $58,475 sent to China Exports Limited back to the undercover bank account due to problems with the receiving bank account. CS-1 was instructed by SANJAY and/or ASHOK to divide this money into two amounts. ASHOK instructed CS-1 to send part of the money to Sinowin Asia Ltd. at Indian Overseas Bank, Tsim Sha Tsui, Hong Kong Branch, and SANJAY instructed CS-1 to send "the dif of 12 to shiv" (meaning the balance to Shivatex Manufacturing Co. account which had been previously sent a wire.)

### July 26, 2007, Transaction

14.     In a chat on July 22, 2007, ASHOK advised CS-1 that "his people have 750"

3

(meaning that his contact in New York had $750,000) ready. They also discussed dates on when the transaction could occur. In a chat between CS-1 and SANJAY on July 26, 2007, CS-1 asked SANJAY to pass a telephone number to the people that were going to deliver the money in New York.

15.    On or about July 26, 2007, CS-2 established telephone contact with a subject at a telephone number that had previously contacted CS-1. ASHOK had originally passed CS-1's telephone number to ASHOK's associates for the pending money laundering transaction. CS-2 and the subject agreed to meet later at an agreed upon street location in Queens, New York. DEA conducted surveillance of the meeting. Law enforcement agents observed a vehicle drive into the meet location with two subjects inside. CS-2 entered the vehicle and met with the two people. CS-2 was then observed exiting a vehicle carrying a brown cardboard box which contained $298,850.00. CS-2 turned the money over to DEA agents. The money was then transported to Miami, Florida, and deposited into the under cover bank account in Miami. CS-1 later provided DEA with the wiring instructions for this money that CS-1 had received from ASHOK in chats. The wires sent per instructions were:

a)    $52,662.00 to an account at BAC Florida Bank for credit to BAC International Bank.  The wire transfer passed through Citibank New York to BAC International in Panama City, Panama.

b)    $71,824.00 to an account at BAC Florida Bank for credit to BAC International Bank account. The wire transfer passed through Citibank New York to BAC International in Panama City, Panama.

c)    $67,248.00 to an account at BAC Florida Bank for credit to BAC International Bank account. The wire transfer passed through Citibank New York to BAC International in Panama City, Panama.

d)    $58,475.00 to an account at Hong Kong and Shanghai Banking Corporation, Hong Kong Office, China.

e)    $30,710.00 to an account at BNP Paribas, Singapore Branch, Singapore.

### Meetings with ASHOK in Miami

16.    On or about September 28, 2007, ASHOK flew into the United States at Miami International Airport. While ASHOK was in the U.S., CS-1 met with ASHOK on several occasions to discuss working together to import loads of cocaine into Florida.

17.    On or about October 2, 2007, an Agent acting in an undercover capacity (hereinafter "the UC") and CS-1 met with ASHOK at a hotel, in Miami Beach, Florida. The UC represented himself to be a supervisor of Long Shore Men at the Port of Miami that had the capabilities of removing items from cargo containers before the container cleared

4

Customs to enter the United States.

18.    According to CS-1, at the meetings held in the Miami area with ASHOK, ASHOK stated that ASHOK had a contact that is smuggling 200 kilograms of cocaine from Panama to New York, New York, every nine days. ASHOK advised CS-1 that ASHOK wanted to ship between 100 to 300 kilograms of cocaine to the Port of Miami several times a month. ASHOK initially asked CS-1 for $30,000 dollars per kilogram of cocaine.

19.    ASHOK advised CS-1 that he (ASHOK) was going to attempt to obtain the money laundering "contract" (meaning provide the services) for laundering the drug proceeds for a recent shipment of 300 kilograms of cocaine that had been made from Panama to New York, New York. ASHOK told CS-1 that ASHOK would use CS-1 to launder the drug proceeds. ASHOK also asked CS-1 if CS-1 would be able to ship funds in bulk currency from the United States to Panama inside containers. ASHOK stated that he knew an individual who worked at the airport in Panama.

### Attempted Importation of 50 Kilograms of Cocaine

20.    In a chat on or about November 30, 2007, ASHOK advised CS-1 that ASHOK attempted to call "Nacho" (the UC Agent). ASHOK advised CS-1 that ASHOK would like to ship 2 bags of 25 (meaning kilograms of cocaine) for a total of 50. ASHOK asked CS-1 if that would be alright.

21.    On or about January 22, 2008, SANJAY engaged in an email chat with CS-1. During the e-mail chats, SANJAY provided CS-1 with the container number and container name which contained the 50 kilograms of cocaine sent by ASHOK. On the same date, CS-1 placed a telephone call to ASHOK. During this telephone call, which was taped with CS-1's consent, ASHOK advised CS-1 that "the lady" (meaning the ship on which the cocaine was secreted) was named Nikolai. ASHOK also advised CS-1 that the Nikolai was already en route to Miami.

22.    On or about January 25, 2008, law enforcement agents responded to Miami Sea Port and observed a container bearing the unique container identification number provided by SANJAY to be removed from the ship Nikolai. The container was subsequently searched for cocaine with negative results.

23.    In a chat on or about January 28, 2008, CS-1 communicated with ASHOK regarding the absence of the 50 cocaine kilograms in the container. ASHOK informed CS-1 that ASHOK had been robbed (meaning the cocaine was stolen from ASHOK.) ASHOK, who was not at the time in Panama, told CS-1 that ASHOK would send another load when ASHOK returned to Panama. ASHOK further advised CS-1 that SANJAY was in Panama and was very scared due to the robbery of the cocaine.

### Conclusion

5

24.     Based upon training and experience, as well as the actions and conversations both leading up to and after the two undercover money pick ups detailed above, I believe that the funds involved in the two transactions in New York are proceeds from the sale of narcotics and that this fact is known by ASHOK and SANJAY.  Some of the facts known to me that lead to the conclusion that the approximately $550,000 are in fact illicit narcotics proceeds are:

a.     In meetings held in Miami, Florida, in September and October, 2007, between CS-1 and ASHOK, ASHOK advised CS-1 that ASHOK was actively involved in the shipment of cocaine to New York via cargo containers.  ASHOK also told CS-1 that he was attempting to get the contract to launder the proceeds of a recent shipment of 300 kilograms of cocaine that had been shipped from Panama to New York.  This is consistent with the money received by CS-2 in New York being the payment to ASHOK for narcotics distributed in New York or being drug proceeds that ASHOK was laundering.

b.     Both transactions involved large amounts of cash money contained in card board boxes delivered in a meeting inside a vehicle parked in a public street by people unknown to CS-1 and CS-2, who did not identify themselves, did not ask for a receipt or otherwise document the transaction.  The currency was tripled rubber banded with no indication (I.E. bank wrappers) that the currency was withdrawn from a financial institution, thus avoiding financial institution reporting requirements.  These facts are consistent with money laundering narcotics proceeds.

c.     One of the individuals that delivered money to CS-2 in New York (whose identify is known to DEA), has a criminal record for conspiracy to distribute cocaine.

d.     CS-1 was directed to wire transfer the narcotics proceeds to several different bank accounts in Asian Markets, a common practice of money launderers engaging in trade based money laundering.

e.     ASHOK and SANJAY converse in coded language over the internet and telephone conversations with CS-1 in order to thwart law enforcement detection.

26.     WHEREFORE, it is respectfully requested that a warrant issue for the arrest of ASHOK and SANJAY consistent with the attached complaint.

FURTHER AFFIANT SAYETH NAUGHT.

Christopher C. Goumenis
Special Agent
Drug Enforcement Administration

Subscribed and sworn to me this
27th day of May, 2008.

STEPHEN T. BROWN
UNITED STATES MAGISTRATE JUDGE

7